## SACRAMENTO SUBURBAN FRUIT LANDS CO. v. HANDLER et al.

### No. 5857.

Circuit Court of Appeals, Ninth Circuit.

May 26, 1930.

Rehearing Denied July 13, 1930.

See, also, 41 F.(2d) 508, 514.

J. W. S. Butler (of Butler, Van Dyke & Desmond), of Sacramento, Cal., and Edward P. Kelly, of Minneapolis, Minn., for appellant.

Ralph H. Lewis and George E. McCutchen, both of Sacramento, Cal., for appellees.

Before DIETRICH and WILBUR, Circuit Judges, and NORCROSS, District Judge.

WILBUR, Circuit Judge.

This is a companion case to Sacramento Suburban Fruit Lands Co. v. Melin (C. C. A.) filed December 17, 1929, 36 F.(2d) 907. It involves the purchase by the appellee of a ten-acre tract of land in the Rio Linda district from the appellant for the sum of $4,001 on the 27th of March, 1927. The allegations of fraud are substantially the same as in the Melin Case; the statute of limitations is not involved; the same experts as to value and as to soil conditions testified in this case as in many of the other cases. Among other witnesses Mr. Herbert Davis testified as an expert on soil conditions, and gave the result of his analysis of the soil, and the defendant introduced testimony of F. E. Twining and A. L. Hyde, who also gave their testimony as to the chemical contents of the soil.

Herbert C. Davis, testifying for the appellee, gave as the results of his analysis, potash, 5,160 pounds per acre foot. Hyde gave 5,600 pounds acid soluble potash per acre foot; and Twining gave 5,600 pounds acid soluble potash per acre foot. Davis gave 1,280 pounds of phosphoric acid per acre foot; Hyde gave as the result of his analysis 1,600 pounds acid soluble phosphoric acid per acre foot; and Twining gave 2,400 pounds acid soluble phosphoric acid per acre foot. The witness Davis did not testify as to the total soil content of potash and phosphoric acid; Hyde gave the total potash as 69,600 pounds per acre foot and of phosphoric acid 2,600 pounds per acre foot; Twining gave 6,600 pounds per acre foot total potash, and 3,040 pounds per acre foot phosphoric acid. Twining was asked to explain the difference between his testimony and that of Mr. Hyde and Mr. Davis and he undertook to do so by explaining the process by which each witness arrived at his analysis. This explanation is important in view of the instructions of the court shortly to be considered. Mr. Twining testified:

"In all the series of cases I have uniformly found a large content of potash and phosphoric acid in the soil, but my results have not exceeded in amount those found by the other chemists; I found on the total phosphoric acid a little more than Mr. Hyde, but he gets more potash than we do, but there is a reason for that. I do not think I have obtained more on the acid soluble method. Mr. Hyde, I think, in some cases obtained more than we. I have not his figures in mind, but I do not think mine have been larger.

512

"In determining the phosphoric acid in the soils we have considerable silica, colloidal silica, that prevents the precipitation of phosphoric acid as a molybdate. In taking the acid solution, dehydrating it in order to overcome that silica, we will get a greater precipitation of molybdate; in many samples, unless you do this, you will get no phosphoric acid at all. On the other hand, with potash, and working with large samples, we cannot get as large an amount of potash in our acid solution as we can with the usual five-gram samples. There is no difficulty, at all, in determining the amount of potash or phosphoric acid in a one-gram sample of soil.

"The difference between Mr. Hyde's and our samples is he did not dehydrate his phosphoric acid samples. * * *

"I know, by a large amount of experience, when we were running samples of these soils, unless we did dehydrate some of the silica you might not get any phosphoric acid, that with the same samples, with the test properly run, we will get several times as much—that is, you will get not much more than Mr. Hyde; I don't know to-day what his was; there was a difference of just a few hundred pounds in the total per acre-foot. I had eight hundred pounds per acre-foot more than Mr. Hyde did; his was .04 acid soluble, and I have one-third more than that, or one-half more. That is possible with that amount of phosphoric acid.

"Q. Mr. Davis was very close to Mr. Hyde, .032. A. With his sample he probably got better results, for instance, that sample, we might run half a dozen samples of it under that method before we got the phosphoric acid down.

"Q. That is your explanation? A. I think if Mr. Hyde was questioned you would find he threw away samples because he did not get anything down.

"Witness continues: I do not think Mr. Hyde kept taking samples until he found one that was large enough to suit him; we can tell in our work whether the process is working right. We started in taking different samples in Rio Linda.

"Q. You took them in the ordinary way, is that true, without taking into account this silica situation which exists here? A. But we use a much smaller sample, therefore we do not have as much silica in the sample. We ran the total, and then ran the acid soluble test. We used the dehydrating process right along. I got ten times as much as Mr. Davis in all the tests made. I did not keep experimenting until I found a method of making

these tests that would produce ten times as much as he; you will find that in the acid soluble all of the way through that I have much more than Mr. Davis, and I know the reason why; because of the dehydrating process and the large sample; you can't get it out of a large sample. I think I testified in one of these cases to that effect, taking a fifty, forty, thirty gram sample. It is usual to cut the sample you use down to a small proportion. It does not make any difference how big it was taken originally, if it was cut down; we might take one hundred pounds of soil and sample that down, but you don't weight the hundred pounds, nor do you make your soil solution from forty grams. Practically all chemists that I know of cut the same sample down, and never use over a ten-gram sample for an acid soluble test. Mr. Davis uses forty."

It will be observed that Mr. Twining testified that without dehydrating the acid solution in order to overcome silica "in many samples unless you do this you will get no phosphoric acid at all," that Mr. Hyde did not dehydrate his phosphoric acid sample, and that he believed that Mr. Hyde "might run half a dozen samples of it under that method before he got the phosphoric acid down, and that he believed that Mr. Hyde would testify that he threw away some of his samples because he could not get anything down.

With reference to this testimony, the court instructed the jury as follows:

"He tells you that he knows of many orchards on like land through this country; he tells you he has analyzed the soil on this land, and that he finds more of these vital food elements than Mr. Davis says he found. In fact, Mr. Twining says that he finds 80 per cent more phosphoric acid than Mr. Davis did, and that he finds 9 per cent more potash than Mr. Davis did.

"The defendants also called Mr. Hyde, another chemist, and he testified to what he found in the analysis of the soil. He analyzed a part of the same sample with Mr. Twining. They took the sample, and each took a part of the sample, and, somewhat curiously, it must be said, Mr. Twining finds 50 per cent more phosphoric acid than Mr. Hyde did out of the same sample; and they find the same in respect to potash. Mr. Twining undertook some explanation of that, he said perhaps that the difference between him and Mr. Hyde was due to the fact that Mr. Hyde, in many samples, did not find anything, and threw them away. Well, the question was put to him, was that in order to

find a sample that would measure up to yours? And Twining said no, he did not think so. But here is the fact in respect to that, gentlemen of the jury, chemical analyses are supposed to be accurate, almost equal to a mathematical demonstration; there must be some allowance for human error, of course, but when they differ so far as in this case, what is a jury to do in respect to expert testimony because you are to determine where the truth lies in respect to it, just the same as with any other witness. You are not obliged to take any expert's testimony, any more than that of any other witness, if it does not commend itself to your judgment. And where they differ so much as here, and where the defendant's own experts will differ 50 per cent in the analysis of the same samples, you can ask yourselves whether you are inclined to rely very much on any expert, or, if you do, upon which one, or determine for yourselves whether this land was adapted to commercial orcharding by reason of their fertility in respect to these mineral elements or not."

The court stated to the jury that Mr. Twining said: "Perhaps that the difference between him and Mr. Hyde was due to the fact that Mr. Hyde, in many samples, did not find anything, and threw them away."

This was not a correct statement of the testimony. The witness Twining stated that "the difference between Mr. Hyde's and our samples is he did not dehydrate his phosphoric acid samples." Again he testified, "Unless we did dehydrate some of the silica you might not get any phosphoric acid, that with the same samples, with the test properly run, we will get several times as much."

There is nothing in Mr. Twining's testimony to lead to the conclusion that he believed he testified that Mr. Hyde got less phosphoric acid content in the soil than Mr. Twining was because Hyde threw away some samples which did not show any phosphoric acid. Mr. Twining's testimony was to the effect that the process used by Mr. Hyde was such that often you would not get "the phosphoric acid down"; that is, if we understand him, it would not form a precipitate because the experiment was conducted under improper conditions, and that, when this occurred, the samples were thrown away, while the impression derived from the instruction of the court is that he threw away the poor samples in order to determine the results only in the case of the better samples. It is true the court said: "Well, the question was put to him, was that in order to find a sample that would measure up to yours? And Twining said no, he did not think so."

As a matter of fact, it is obvious that, if Mr. Twining took the general run of the samples and gave an average result, and Davis did the same thing, rejecting the poorest samples, the tendency of such a process would be to increase the average in the Davis samples as compared to the Twining samples, whereas Twining was undertaking to explain why Davis' samples were less than his own, which illustrates the fact that the testimony of Twining in regard to the discarding of the samples has nothing whatever to do with the results, and merely indicated the process of analysis which was not completed because of defective methods. The effect of using the testimony of Mr. Twining to discredit the methods of Mr. Hyde and of asserting to the jury in effect that there should be no difference in chemical analysis which should be almost equal to mathematical demonstration was to lead the jury to discredit the testimony of Mr. Hyde because of the inference suggested by Mr. Twining that he had thrown away poor samples, and to discredit Mr. Twining because he disagreed with Mr. Hyde more than 50 per cent. as to the phosphoric acid content of the soil, and to discredit them both when in opposition to Mr. Davis they testified that the soil contained sufficient food values, while Mr. Davis testified that they never had half enough.

This instruction, and others, are argumentative and unfair within the rule as stated in Sacramento, etc., v. Parker (C. C. A.) 36 F.(2d) 926.

Judgment reversed.